SAMUEL, Judge.
This is an appeal by the defendant from a judgment, in favor of plaintiff and inter-venors, making permanent a preliminary writ of injunction previously issued. The judgment granting the preliminary injunction was also appealed to this court and was affirmed (City of New Orleans v. Cantelli, La.App., 91 So.2d 609).
The suit was instituted by the City of New Orleans against defendant, the owner of property designated by the Municipal Nos. 1336-38 Lowerline and 7510 Willow, Streets, at the corner of Lowerline and Willow Streets in New Orleans, and sought to enjoin defendant from using said property as a multiple dwelling or “rooming house” in violation of the pertinent provisions of the Comprehensive Zoning Ordinance of the City of New Orleans, Ordinance No. 18565 C.C.S. The suit also sought an order directing defendant to correct certain specifically enumerated unsanitary conditions existing in the premises in-violation of the Health Ordinance of the City of New Orleans, Ordinance No. 16308 C.C.S. Intervenors are a number of persons who own property and reside in the vicinity of the property involved.
The preliminary writ of injunction, which was granted solely’ upon the verified pleadings and supporting affidavits of both sides, ordered the defendant to vacate the premises and to cease from using the same until the health and zoning violations had been corrected. The judgment now on appeal simply makes this preliminary injunction permanent.
The record contains uncontradicted evidence, by documentary proof and testimony, both emanating from the Health Department of the City of New Orleans, and here we refer particularly to a letter from the Director of the Bureau of Public Health Sanitation and to the testimony of a sanitary supervisor for the Health. Department, to the effect that the health and sanitary violations originally complained of by plaintiff have been corrected. Plaintiff offered evi *840 dence purporting to show the condition of the buildings at the time of the trial of the permanent injunction, hut, as correctly pointed out by the trial judge, the buildings then having been unoccupied over a period of time by virtue of the preliminary injunction, evidence as to the then present sanitation and health violations were improper and immaterial even though such evidence might be used in another action at a later date. Thus the health ordinance is no longer involved and we can be concerned only with the problems presented by the Comprehensive Zoning Ordinances.
The Zoning Law, No. 18565 C.C.S., was adopted and became effective in July, 1953. It divides the city into districts and provides the use to which property may be put in each district. Under its provisions the defendant property is located in a “B Two Family District” in which the operation of a multiple dwelling is not among the permissible uses. However, this law contains a provision, Art. XXIV, which would permit defendant to continue to use his property as a multiple dwelling if such use lawfully existed at the time of the adoption of the ordinance and remained nonconforming thereafter. Except for a slightly different wording, the same provision is to be found in the predecessor of the present zoning law, Comprehensive Zoning Law Ordinance No. 11302 C.C.S., particularly Sec. 10 thereof. Thus it is possible for a lawful use which existed at the time of the adoption of the first zoning ordinance in 1929 to be continued even though it did not conform with the provisions of either that first ordinance or the ordinance of 1953.
The defendant admits that his use of the buildings was not in conformity with the provisions of either the 1929 or 1953 zoning ordinances, but he contends that the buildings were used as multiple dwellings or “rooming houses” prior to 1929 and thereafter and, therefore, that the premises have acquired a legal nonconforming status and their use cannot now be restricted to a “B” residential or two-family area. . On the other hand, plaintiff contends that the nonconforming use did not begin until after 1929 and, therefore, that no legal nonconforming use could have been acquired. This is the only issue we are called upon to decide.
We are now presented with a different situation from that which existed in connection with the preliminary injunction, which was heard only on the verified pleadings and the affidavits submitted by both sides and in which it was necessary for plaintiff to establish only a prima facie case. Defendant’s contention is an affirmative defense and he bears the burden of proving the same by a preponderance of the evidence. LSA-R.S. 13:4062 et seq.*; Baton Rouge Cigarette Service v. Bloomenstiel, La.App., 88 So.2d 742 and cases cited therein. In addition, some of the affiants, whose affidavits were submitted on the hearing of the preliminary injunction for the purpose of proving the use to which the premises were put both prior to and after 1929, did not appear as witnesses at the trial on the merits.
It is necessary that we briefly discuss the testimony given at the trial on the merits by all of the witnesses whose testimony is material to the one issue we are required to decide. Plaintiff called three of such witnesses and the defendant called eleven.
Bertrand I. Cahn, a plaintiff witness, testified that he first saw the premises in 1952 or 1953, about the time that his daughter and son-in-law bought a piece of property in the neighborhood. He went into the buildings on three or four occasions accompanied by W. Blair Lancaster, an assistant city attorney then assigned to the Board of Health. On these occasions he saw numerous negro tenants and many children. Twenty-five or twenty-six rooms in the premises were occupied by several families, each family or individual occupying only one room. The balance of his tes *841 timony is concerned with the health and sanitation feature of this case with which, as pointed out above, we can be no longer concerned.
Christine Featherstone, also a plaintiff witness, testified that she first met Esaul Hymes and his wife, the latter being an aunt of this witness’s husband, in the year 1933 after her marriage to Featherstone. (Testimony by later witnesses establishes the fact that Esaul Hymes was the original owner and builder of the premises.) After meeting the Hymes she visited them frequently at their home at 1336-38 Lower-line. The Hymes and their daughter lived upstairs and Julia Featherstone, a sister of Mrs. Hymes, lived downstairs with her husband. (The reference here is to Julia Featherstone Hill and her husband, Norris Hill, whose later testimony on behalf of defendant flatly contradicts this witness’s testimony regarding the number of occupants in the Lowerline building.) She never saw anyone else living in the house although she visited in both the Hymes apartment upstairs and the apartment of the sister downstairs. She only visited in the living room and bed room of the Hymes quarters and in the living room where the sister lived and did not know how many rooms were occupied by either family. She had never been in any other part of the building. Her impression was that the building was a single, two-story house occupied by a family downstairs and a family upstairs. She had no recollection of the building 7510 Willow Street and could not recall whether or not there was such a building.
Joseph E. Simpson was plaintiff’s last witness. He testified that he had lived in the immediate vicinity of Willow and Low-erline Streets, at 1339 Lowerline, from 1919 until May of 1957. When he first became familiar with the property 1336-38 Lowerline it was owned by Hymes who lived at that address. The building was occupied by the Hymes family and became a rooming house about 1933. His conclusion that it had become a rooming house at that time is based on the fact that he could see more occupants then, which additional occupants he would have noticed in 1929 if there had been any such. He was unable to testify about the building 7510 Willow Street. On cross examination he admitted that he had never been inside of the building at 1336-38 Lowerline, nor did he know how many people were in the Hymes family. He was aware of the fact that the place was a rooming house after 1933 because he had to call the police on several occasions in connection with disturbances. We are not impressed by his testimony.
The testimony of the defendant was given when he was called by plaintiff for cross examination. He acquired the property in 1943 at which time it was occupied by twenty-six families. Such occupancy, by this and later by a greater number of persons or families, was continued until the preliminary injunction was granted.
Julia Featherstone Hill, the same person who was referred to in the testimony of Christine Featherstone, was a defense witness. She testified that she was a sister of the wife of Esaul Hymes who owned the property. The buildings, 7510 Willow Street and 1336-38 Lowerline Street, were constructed by Hymes in 1909 and 1913. One, the Willow Street address, was a two-story house with six rooms. The other, on Lowerline, was a two-story house .with sixteen or seventeen rooms. Her sister occupied-six rooms and a kitchen on the left upper side of the Lowerline address and there were five rooms on the right upper side; there were four rooms on the lower floor. Prior to 1920 and continuously thereafter to 1955 (the year in which the preliminary injunction was issued) all of the Lowerline building, other than that portion actually occupied by this witness’s sister, was rented out by rooms. The Willow Street building was rented out by rooms continuously from the date of its construction in 1913. This witness lived in the premises for several months in 1934 and then again from 1940 to 1948.
*842 The testimony oí Norris Hill, husband of the preceding witness and also called by the defendant, although not in the same degree of detail, is substantially the same as that given by his wife.
Joseph C. Meynier, Jr., was also called as a witness by the defendant. He had been connected with a hardware store in the vicinity of the property and had made deliveries to the premises beginning in 1929. At that time the property was owned by Hymes and this witness’s recollection is to the effect that there could have been three or four apartments in the “project” with some apartments occupying several rooms. He did not know what the occupancy of the Willow Street building was. His recollection is vague and his testimony unimpressive.
Bertha Gross, also a defense witness, gave her address as 1216 Hillary Street, about three or four blocks from the property with which we are concerned, and testified that she had been living at that address since 1905. She was well acquainted with the Hymes family but had never been inside the buildings. As far back as she can remember these buildings had been operated as rooming houses. She was a small child when she moved into the neighborhood but her memory does go back to well before 1929. She was unable to testify to any certain number of people or families occupying the premises but she believed that it was more than ten.
Olivia Miller, a defense witness, testified that she had been a resident of, and rented a room in, the premises from 1916 to 1927, during all of which time the premises had been rented by rooms, there having been seven such rented rooms downstairs and five upstairs in the Lowerline building and four such rooms, two upstairs and two downstairs, in the Willow Street building. In addition, the Hymes family occupied five rooms in the Lowerline building. After moving in 1927, and before and after 1929, she visited the property to see the Hymes and also to see this witness’s niece, Beulah Foster, who lived there as a tenant for sometime after Cantelli purchased the property. During all of this time the property was rented out by rooms. An old receipted bill dated in 1926 and addressed to this witness at 1338 Lowerline Street was introduced in evidence in connection with her testimony and identified by the witness.
Elmo Smith, a defense witness, testified that he was a resident of the premises from 1924 to 1928, occupying a rented room on the upper floor of the Lowerline building. He further testified that during this period and in 1929 the Hymes family occupied five rooms and the balance of the rooms were occupied by roomers, four on the 1336 side where he lived and approximately eight on the lower floor. The other building, 7510 Willow, contained six rooms, three upstairs and three downstairs, all of which were occupied by tenants. In connection with his testimony he identified, and there was introduced in evidence, a receipted bill dated November 12, 1927, which shows his address as 1336 Lowerline Street. He also testified that, after the death of Hymes and his wife, their daughter occupied some of the rooms in which they had formerly lived and the balance thereof were rented to additional roomers.
John Mason, a defense witness, testified that he moved into the premises in 1939 as a tenant, that he had been familiar with the property since 1921, and that from 1921 to 1950 he knew that the property had been used as a rooming house. In response to a question relative to how many families were living in the premises in 1929 his answer was about sixteen or seventeen.
Ernest Broom, a defense witness, testified that he had lived in the premises from 1923 to 1936 as a tenant downstairs on the front Willow Street side. During that time all of the property except that occupied by the Hymes family was rented as rooms, each room being rented to a separate tenant (or family of tenants).
Flora Campbell, also for the defendant, did not testify but by stipulation between *843 counsel her affidavit was introduced in evidence. That affidavit is to the effect that she was a resident of the premises from 1929 to 1933 and from 1936 to 1955; that since 1929 the premises had been used as a rooming house and had been occupied by at least sixteen tenants.
Demethrie Baker, wife of John W. Mason, a defense witness, also did not testify but by stipulation between counsel her affidavit was introduced in evidence. The affidavit recites that she knew the Hymes family since 1925, that she lived in the premises, 7510 Willow Street, from 1938 to 1939, and that the premises were used as a rooming house from prior to 1925 continuously to 1939, being occupied during that time by at least twenty tenants.
It is clear from the testimony of the various witnesses that, while they use the words “rooming house”, these rooms were not used merely for sleeping purposes but were also equipped with cooking facilities. Therefore the proper designation of the premises under the terminology of the zoning laws is “multiple-family dwelling”, which is defined by Art. Ill (17) of the Comprehensive Zoning Law of the City of New Orleans of 1953 as a dwelling designed for or occupied by five or more families. We mention this only because the question was argued before us. As we have already pointed out, under the nonconforming clause contained in both zoning ordinances the particular type of lawful use to which the buildings had been continuously put prior to the enactment of those laws may be continued after the enactment thereof and despite nonconformity therewith.
We are cognizant of the fact that these buildings, and their tenement-type use, are detrimental to the surrounding neighborhood, and sympathize with the in-tervenors. But this can play no part in our decision. We are convinced that the defendant has proved his contention by more than a preponderance of the evidence.
For the reasons assigned, the judgment appealed from is annulled and reversed and it is now ordered that there be judgment in favor of the defendant and against the plaintiff and the intervenors, dissolving the writ of preliminary injunction herein issued and rejecting and dismissing the demands of the plaintiff and the intervenors.
Reversed and rendered.

 Now LSA-C.C.P. art. 3601 et seq.